IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MELCROFT COAL COMPANY, INC,      )
                                 )
            Plaintiff,           )   No. 2:24-cv-707
                                 )
      v.                         )
                                 )
ROBINDALE ENERGY SERVICES,       )
INC. & LCT ENERGY, L.P.,         )
                                 )
            Defendants.          )

## MEMORANDUM ORDER

**J. Nicholas Ranjan, United States District Judge**

This case concerns a dispute over how coal royalties are calculated. Melcroft owns the coal, and leases the coal rights to LCT, in exchange for a royalty. In calculating the royalty, LCT deducts railway transportation and marketing costs. Melcroft claims that the lease doesn't allow for these deductions, so it brought this lawsuit.

On review of the summary-judgment record, the Court finds that the lease permits these deductions, so there's no express breach of the lease. That said, the Court also finds that there are disputes of material fact over whether the parties orally modified the lease to have royalties calculated based on "clean coal at the plant"—in other words, without the rail and marketing deductions. That question must be resolved by the jury.

## FACTUAL BACKGROUND

In the light most favorable to Melcroft, the facts are these:

Melcroft owns various tracts of land in Pennsylvania with mineable coal on its grounds. ECF 1; ECF 31-1. In 2004, Melcroft and Amerikohl Mining, Inc. reached an agreement where Melcroft allowed Amerikohl to mine its coal in exchange for

royalty payments.  *See* ECF 31-1.  The parties never limited the lease to a particular type of coal, but they originally wrote the lease for steam coal.  ECF 31-6 at 31:3-32:11.  About seven years later, with all parties' consent, Amerikohl assigned the lease to Robindale.  ECF 31-3.  Robindale then assigned the lease to its affiliate, LCT.[1] The parties never made any written changes to the lease.

Part of Melcroft's property subject to the lease included Rustic Ridge.  ECF 31-6 at 23:9-24:19.  In 2019, after obtaining the necessary permits, LCT began mining at Rustic Ridge.  ECF 31-7 at 22:20-21, 24:17-19, 38:22-39:4; ECF 31-8 at MC 1247–48; ECF 31-6 at 37:2-6.  But at Rustic Ridge, LCT's mining operations focused on producing metallurgical coal ("met coal") instead of steam coal.  ECF 31-6 at 31:3-32:11.[2]  Met coal is more valuable than steam coal.  ECF 31-6 at 66:15-21.

Met coal is also more expensive for LCT to produce compared to steam coal.  At Rustic Ridge, LCT first mines the subsurface coal, bringing the coal to the surface.  ECF 31-7 at 34:21-35:2.  From there, LCT screens the mined coal, loads it for transport, and then trucks the coal to a cleaning plant.  *Id.*  After cleaning the coal, LCT takes the remaining coal offsite and sells it.  ECF 31-7 at 35:24-36:9.  A third party transports the met coal by railway from the cleaning plant to the port where LCT sells the coal.  ECF 31-7 at 45:15-20, 47:14-17.  LCT pays the third party for the rail transportation.  ECF 31-7 at 45:15-20, 47:14-17.

Throughout this process, LCT weighs the coal several times.  It first weighs the coal at Rustic Ridge that it then loads onto the truck for transport to the cleaning plant.  ECF 31-7 at 35:4-16.  Then, LCT weighs the coal at the cleaning plant before

---

[1] The lease requires that all assignments are approved of in writing first.  ECF 31-1 at ¶ 16.  Robindale never received Melcroft's written consent first, but Melcroft has since clarified that it has no objection to this assignment.  ECF 31-6 at 23:5-24:25.

[2] Although the lease was for steam coal, Melcroft expected when it signed the lease that Rustic Ridge would be mined for met coal.  ECF 31-6 at 31:23-32:5.

cleaning the coal.  *Id.*  And LCT weighs the coal again after the wash process before rail transport.  *Id.*

To calculate Melcroft's royalty payment, LCT starts off with the sale price of the coal and then subtracts all the costs that it incurred in selling the cleaned coal. ECF 31-7 at 29:19-24, 47:23-53:9; ECF 31-6 at 79:7-80:25; ECF 31-8 at MC 94.  These include the costs of transporting the coal to the cleaning plant, the costs of cleaning the coal, and the costs of transporting the coal from the cleaning plant to the port and marketing costs for the coal.  ECF 31-7 at 29:19-24, 47:23-53:9; ECF 31-6 at 79:7-80:25; ECF 31-8 at MC 94.  After subtracting those costs from its monthly sales, LCT then multiplies that net-sales price by 5% to calculate Melcroft's appropriate royalty fee.  ECF 31-8 at MC 15.  The following graphic from Melcroft's brief shows the movement of coal and the different costs along the way.



ECF 33 at 5.

Defendants represent that "[t]here has never been a change in how Melcroft's royalty payment [is] calculated."  ECF 30 at 6.  There are, however, two changes in costs that LCT has incurred in selling the coal.  Before 2022, LCT would "sell" the cleaned coal at the plant to its affiliate Robindale, before the coal hit the railways for transport.  ECF 31-7 at 45:1-20.  Because these sales took place before the railway

transport, LCT did not subtract rail charges from the sales price in its royalty payment to Melcroft. *Id.* That changed in February 2022. Since then, LCT now holds title of the coal until the sale at the port, meaning that it holds title while it transports the coal on the railways. *Id.* LCT started subtracting the rail charges from the sale price in calculating Melcroft's royalty payment in February 2022. *Id.* In 2023, LCT also began subtracting marketing costs from the sale price. *Id.*; ECF 31-11.[3]

Melcroft's breach-of-contract claim is specific. Melcroft claims that LCT has breached the lease by subtracting the railway transportation costs and marketing costs in calculating royalties. ECF 1 at ¶¶ 31–33. Melcroft claims that it is entitled to $933,803.52 for the "improper deductions which continue[] to accrue." *Id.*

Melcroft has two theories that it believes supports its breach-of-contract claim. It argues that the lease is ambiguous, and so the issue must be submitted to the jury. And it argues that the parties, in any event, orally modified the lease to disallow the rail transportation and marketing costs.

Defendants moved for summary judgment (ECF 29), the parties filed briefs (ECF 30, ECF 33, ECF 34), and the motion is ready for disposition.

## DISCUSSION & ANALYSIS

A court may grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must ask if, based on the record, a reasonable jury could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "All reasonable inferences from the record must be drawn in favor of the nonmoving party." *Goldstein v. Repossessors Inc.*, 815 F.3d 142, 146

---

[3] It's unclear to the Court where the marketing costs were incurred—*i.e.*, before the cleaning plant, after the plant, or both. Based on the nature of Melcroft's claim and the parties' arguments, it is safe to assume at least some of these costs were incurred or allocated to points after the cleaning plant.

(3d Cir. 2016) (cleaned up). Summary judgment is improper where a reasonable jury could find for the nonmoving party. *Id.* But summary judgment is proper where the nonmoving party will bear the burden of proof at trial and the record does not "establish the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Under Pennsylvania law, the plaintiff in a breach-of-contract suit must prove that (1) a contract existed, (2) the defendants breached the contract, and (3) damages resulted from the defendants' breach. *Pa. Supply, Inc. v. Am. Ash Recycling Corp. of Pa.*, 895 A.2d 595, 600 (Pa. Super. Ct. 2006) (citing *Corestates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). Here, the parties agree that they have a contract. The dispute between Melcroft and Defendants comes down mainly to breach and, to a lesser extent, damages.

Melcroft argues that if the written lease controls, the ambiguous terms do not permit LCT's practice of taking deductions. It further argues that the orally modified contract did not permit LCT's practice. The Court takes each argument, in turn.

## I. The unambiguous terms of the lease allow LCT's deductions.

Melcroft argues that the terms of the lease are ambiguous as to whether the lease allows LCT's deductions. The Court disagrees. The language is plain and clear; the lease authorizes LCT to deduct rail and marketing costs to obtain the coal's value "at the pit."

Section 3(a) of the lease requires that the royalty be calculated based on "the average gross monthly selling price to all bona fide arm's length third party purchasers loaded into trucks at the pit." ECF 31-1 at ¶ 3(a).[4] Melcroft says "at the pit" is ambiguous, and it could mean "at the cleaning plant." Not so.

---

[4] Section 3(a) provides: "Where Lessors own the coal only: 5% of the average gross monthly selling price to all bona fide arm's length third party purchasers loaded into trucks at the pit or $0.80 per ton, whichever is greater, for each net ton of two

The coal "pit" is where the coal is mined.  That is the ordinary definition, the parties' understanding, and no one could reasonably conclude otherwise.  *See* ECF 31-9 at 8; ECF 30 at 5; *pit*, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/pit.  So, when LCT calculates royalties, it takes the higher "downstream" sales price, and deducts the costs incurred to get to the coal from the pit to that sales point, in order to determine the lower value of the coal "at the pit." It then pays the royalty based on that value.  The "pit" value is a lower value, for sure, because the coal is raw, hasn't been treated, cleaned, or moved.  But the parties contracted here to essentially share in the costs to move the coal, not give Melcroft a windfall of a royalty based on a higher sales value without contributing to the costs to get to that value.  Netting back the value of the coal at later "downstream" sales points is appropriate, and consistent with the lease.

Melcroft's attempt to create an ambiguity falls flat.  Indeed, Melcroft does not contest LCT's "deductions for loading fee, trucking, reject cleaning, hauling costs, screening, and excise tax."  ECF 33 at 5.  Those are all costs that LCT incurred moving the coal from the pit to the cleaning plant and then the costs of cleaning the coal.  In essence, Melcroft argues that "at the pit" should instead mean "at the cleaning plant." But why?  There is no reasonable basis for this contractual interpretation, and so it doesn't create an ambiguity.

Indeed, Pennsylvania law aligns.  For example, in *Shoemaker v. Mt. Lookout Coal Co.*, the Pennsylvania Supreme Court considered a similar contract phrase to "at the pit," there, "at the breaker."  35 A. 731, 731 (Pa. 1896).  The contract at issue in *Shoemaker* outlined a royalty payment structure from a coal mining operation where the lessee would receive payments based on the price of coal "at the breaker," the location where the company sorted the mined coal and loaded the coal for

---

thousand (2,000) pounds for all coal mined and removed from the Premises."  ECF 31-1 at 3(a).

transport before selling.  *Id.*  The court found that the term "at the breaker" did not mean the price literally "at the breaker," because the lessor did not sell coal at the literal breaker.  *Id.*  Rather, the lessor sold the coal at various points of delivery, and the custom of the trade allowed the lessor to subtract both selling and transportation costs from the royalty calculation.  *Id.*[5]

So too here.  Though not identical, the phrases "at the breaker" and "at the pit" are analogous.  In both cases, the lessor did not sell coal directly at the location referenced in the contract, either the breaker or the pit, but incurred selling and transport costs to sell the coal at a later point.  It tracks that the lease permits the lessor to subtract those costs from royalty payments in contracts like these.

The contract is clear, and Melcroft cannot state an express breach-of-contract claim.

## II.    Melcroft's oral-modification theory must be presented to the jury.

Perhaps acknowledging the weakness of its contractual interpretation, Melcroft pivots.  It argues that even if the terms of the lease allowed the deductions, the parties orally modified the lease to provide otherwise.  On this score, Melcroft has adduced sufficient evidence to create a dispute of fact to proceed to trial.

Pennsylvania law permits oral modifications to written contracts, "even when the written contract provides that modifications may only be made in writing." *Somerset Cmty. Hosp. v. Allan B. Mitchell & Assocs.*, 685 A.2d 141, 146 (Pa. Super. Ct. 1996) (citing *Universal Builders, Inc. v. Moon Motor Lodge, Inc.*, 244 A.2d 10 (Pa. 1968)).  If the plaintiff alleges that the parties made such a modification, the plaintiff must prove the oral modification by "clear, precise and convincing evidence."  *Id.*  The parties' performance during their contract is relevant evidence for determining

---

[5] There is similar support in the oil-and-gas context.  *See Kilmer v. Elexco Land Servs., Inc.*, 990 A.2d 1147, 1158 (Pa. 2010) (allowing for post-production deductions in calculating royalty based on value "at the wellhead").

whether they modified a contract.  *See* 13 Pa. C.S.A. § 1303(f); *see also Moore Eye Care, P.C. v. ChartCare Sols. Inc.*, 364 F. Supp. 3d 426, 432 (E.D. Pa. 2019).  Unless an oral modification is unsupported by the record, the claim is best left to a jury. *Somerset*, 685 A.2d at 147 (citing *E. Texas Motor Freight, Diamond v. Lloyd*, 484 A.2d 797 (Pa. 1984)).

In the lease, Melcroft agreed that "no amendment shall be valid unless made in writing and duly executed."  ECF 31-1 at ¶ 16.  At trial, Melcroft would have to support its oral-modification theory by clear, precise, and convincing evidence.  In the light most favorable to Melcroft, it has made a sufficient showing to try its claim before a jury.  The evidence establishes the following.

Melcroft's President, Hobert Orton, met with Robindale's VP of Acquisitions and Property Development, Gil Widenhofer, on two separate occasions to discuss how Defendants ought to pay royalties to Melcroft based on the met coal coming out of Rustic Ridge.  ECF 31-6 at 49:15-50:8; ECF 1 at ¶ 18.  Mr. Orton claims that in both of those conversations, the parties agreed to modify the royalty payment structure. ECF 31-6 at 49:1-50:8.  Rather than "at the pit," Mr. Orton claims that the two verbally agreed that Defendants should pay Melcroft based on "clean coal at the plant."  *Id.*

There is evidence on the record to support Melcroft's theory of an oral modification.  To begin with, there is Mr. Orton's testimony.  He claims to have modified the lease through a conversation with a representative of Defendants, and a jury could credit that testimony to clearly establish an oral modification. Defendants' corporate representative, Jason McGinnis, acknowledged in his deposition that Mr. Orton and Mr. Widenhofer met to agree on how Defendants should calculate royalties to Melcroft.  ECF 31-7 at 27:22-28:20.  Mr. McGinnis disagrees with Mr. Orton as to what the two parties agreed to, but a jury could use

this evidence to corroborate the meeting and potentially credit Melcroft's assertion that there was an oral modification to the contract.

There's more evidence.  In 2019, Mr. Widenhofer emailed Mr. Orton to explain how Defendants calculated the royalty price and never mentioned subtracting railway or marketing costs.  ECF 31-8 at MC 1297.  Defendants agree that before 2022, LCT never subtracted rail charges from the sales price in its royalty payment to Melcroft.  ECF 31-7 at 45:1-20.  Defendants have an explanation for the change in calculation: before 2022, LCT "sold" the coal to Robindale before railway transport and thus before rail charges, but LCT stopped this practice and sold the coal after transport starting in 2022.  *See id.*  That doesn't win the day on summary judgment.  A jury is free to make its own determination on whether Defendants' explanation is credible or whether Defendants breached their oral modification to the lease.  Additionally, correspondence shows that even after LCT assumed the railway charges before selling the coal, it did not include railway transport costs in its royalty deductions in April–August 2022.  ECF 31-4.  LCT claims that this was just an oversight, but a jury can choose to accept or reject that explanation, too.  *See id.*  The parties' course of performance here creates sufficient triable issues to potentially support Melcroft's oral-modification claim.

Oral modifications to a written contract, as both parties agree, require additional consideration.  *See, e.g.*, *Barnhart v. Dollar Rent A Car Sys., Inc.*, 595 F.2d 914, 919 (3d Cir. 1979).  LCT asserts that even if there were an agreement to modify, there was no consideration for the modification.  ECF 30 at 16–17.  Melcroft argues that tailoring the agreement to met coal as opposed to the originally contemplated steam coal is additional consideration.  The Court finds that the certainty provided by better tailoring the royalty agreement to the met coal production is sufficient consideration.  *See Oasis International Waters, Inc. v. United States*, 134 Fed. Cl. 155,

189 (2017) (noting that offering certainty was valid consideration for a modification to a contract).

A theory of oral modification to a contract is best left to a jury unless unsupported by the record. *Somerset*, 685 A.2d at 147. When viewed in the light most favorable to Melcroft, the record of testimony, correspondence, and course of performance supports Melcroft's theory. The Court therefore finds genuine disputes of material fact about whether there was an oral modification to the written lease.[6]

*** 

For these reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' summary-judgment motion. Melcroft's breach-of-contract claim, Count I, survives, but only under the theory of an oral modification. Melcroft may not present any theory of breach of the written lease. The Court enters judgment for Defendants as to Count II, based on the parties' agreement.[7]

Dated: February 4, 2026                    BY THE COURT:

                                           */s/ J. Nicholas Ranjan*
                                           United States District Judge

_____

[6] LCT also makes a damages argument, claiming that even if Melcroft is right about the deductions from the 5% royalty, it suffered no damages because the lease allows for an alternative method of calculating the royalty—*i.e.*, a straight $.80/ton. ECF 30 at 8. This argument, though, is tethered to the oral-modification claim, and depends on whether the jury concludes that the parties orally modified the lease, and the scope of any modification. So it's better resolved at trial.

[7] Melcroft concedes that Defendants are entitled to summary judgment as to Count II (unjust enrichment) because both sides agree that the contract controls. ECF 33.